UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

FRANK J. GRADY,                )
          Plaintiff            )
                               )
              v.               )    C.A. No. 11-cv-30068-MAP
                               )
MICHAEL J. ASTRUE,             )
Commissioner, Social           )
Security Administration,       )
          Defendant            )


MEMORANDUM AND ORDER REGARDING
PLAINTIFF'S MOTION TO REVERSE OR REMAND THE DECISION OF THE
COMMISSIONER AND DEFENDANT'S MOTION FOR ORDER AFFIRMING THE
DECISION OF THE COMMISSIONER
(Dkt. Nos. 8 & 11)

September 28, 2012

PONSOR, U.S.D.J.

## I. INTRODUCTION

This action seeks review of a final decision of the

Commissioner of Social Security ("Commissioner") denying

Plaintiff's applications for disability insurance benefits

("DIB"), Supplemental Security Income ("SSI"), and Child's

Insurance Benefits.  Plaintiff filed his applications on

October 15, 2008, alleging disability since October 2, 2002,

due to neck and shoulder pain, as well as depression.  All

applications were denied initially and upon reconsideration.
After a hearing on September 21, 2010, the Administrative
Law Judge ("ALJ") found that Plaintiff was not disabled and
denied Plaintiff's claims.[1]  (A.R. 26-36.)  The Decision
Review Board did not complete its review of the ALJ's
decision within ninety days, thereby making the decision
final.  Plaintiff filed this complaint on March 17, 2011.

Plaintiff now moves to reverse or remand the case to
the Commissioner for reconsideration (Dkt. No. 8), and
Defendant moves for an order affirming the decision of the
Commissioner (Dkt. No. 11).  As will be seen, there are
certain features of this review process that have given the
court concern.  In the end, however, Plaintiff has been
unable to carry his burden to show that the ALJ's decision
was unsupported by "substantial evidence."  For that reason,
Plaintiff's motion will be denied, and Defendant's motion

---

[1] The ALJ denied Plaintiff's DIB and SSI claims without
directly addressing his Child's Insurance Benefits claim.
The Child's Insurance Benefits claim, however, would be
analyzed under the same five-step sequential process as the
other two claims. Since Plaintiff has not qualified as
disabled for purposes of DIB or SSI, he would not qualify
for purposes of Child's Insurance Benefits.  Accordingly,
the ALJ's failure to address the Child's Insurance Benefits
claim was a harmless oversight.

will be allowed.

## II. <u>FACTS</u>

At the time of the ALJ's decision, Plaintiff was twenty-eight years old and homeless.  He had completed tenth grade in high school and previously worked as a laborer. (A.R. 188.)

### A.   <u>Physical Conditions</u>.

Plaintiff first injured his neck while wrestling when he was a teenager.[2]  (A.R. 350.)  On September 24, 2006, a cervical MRI revealed significant reversal of normal cervical lordosis with congenital spinal canal narrowing, a focal left-sided disc osteophyte complex at C7-T1, and small broader disc osteophyte complexes at C5-C6 and C6-C7.  (A.R. 324-24.)  A thoracic MRI taken the same day demonstrated normal alignment and signal intensity.

On October 4, 2007, Plaintiff visited Dr. Muhammad Isa for a pain management consult.  At the time, Plaintiff was twenty-five years old, and he reported that he had been suffering for the previous two years with chronic pain in

---

[2] Plaintiff's medical records dated August 30, 2006, show Plaintiff reporting a date of onset of the pain as some time in January 2006. (A.R. 297.)

his left upper back and shoulder.  (A.R. 290.)  Dr. Isa
observed that Plaintiff had no discomfort while sitting in a
chair, no sensory deficits, no signs of musculoskeletal
wasting or atrophy, and no loss of range of motion of
lumbosacral spine or cervical spine.  The doctor did note
that Plaintiff had increased pain on turning toward the left
side and during left lateral bending.  Also, "[t]enderness
was appreciated over the left paracervical muscles and left
suprascapular muscles and just medial to the left scapula in
his upper back." (A.R. 291.)  Dr. Isa found the examination
to be indicative of myofascial pain syndrome, noting the
findings from Plaintiff's cervical MRI.

On January 15, 2008, Plaintiff sought a comprehensive
physical examination required by the Carpenters' Union.  The
medical provider who conducted the exam cleared Plaintiff
for employment and noted that his neck pain was "improved."
(A.R. 266.)

On May 21, 2008, Plaintiff saw Dr. Barry Poret, a state
agency doctor, for a disability review.  In examining
Plaintiff, Dr. Poret noted full range of motion in flexion,
extension, turning, and tilt, though a right tilt resulted

4

in a grimace of pain.  Dr. Poret found Plaintiff's neck pain

to be of "unclear etiology that is either muscular or

psychogenic." (A.R. 256.)  Additionally, he opined that

Plaintiff likely did have attention deficit disorder ("ADD")

based on his vague and distractible affect during the exam.

On October 15, 2008, Plaintiff underwent a cervical

spine X-ray that revealed a prominent reversal of the upper

cervical spine, with no accompanying compression fracture or

malalignment.  The film did show a slight narrowing of the

C2-C3 disc space and a foraminal narrowing. (A.R. 280.)  Two

weeks later, on October 27, 2008, a cervical MRI revealed

three broad bulges that mildly or moderately narrowed the

spinal canal, and the doctor concluded that Plaintiff had

multilevel disc disease with focal effacement of the cord on

the right side at C6-C7. (A.R. 304-05.)

On January 16, 2009, Plaintiff sought an orthopaedic

consultation regarding his neck pain.  Plaintiff reported to

the doctor that he had tingling in his hands, especially

after sleeping at night, but he had no bladder or bowel

dysfunction or numbness in the lower extremities.

Additionally, Plaintiff stated that working above shoulder

level caused him pain.  The doctor's physical exam noted
limitation of motion and flexion in the neck, some mild
muscle spasm, and positive Spurling's sign bilaterally,[3]
along with full muscle strength in all major muscle groups
and equal and symmetrical reflexes.  (A.R. 350.)  Finally,
the doctor assessed "[r]ather profound degenerative
arthritis" in Plaintiff's neck "with evidence of
neuroforaminal encroachment and also cord effacement
secondary to osteophyte formation" from the arthritis. (A.R.
349.)  The doctor recommended an aggressive program of neck
rehabilitation therapy.

B.   Mental Conditions.

On March 10, 2008, Plaintiff received a diagnostic
evaluation from Dr. Amy Barnard, of Clinical Support
Options.  As part of Plaintiff's history, the doctor noted
that he had taken Ritalin as a child but otherwise had no
psychiatric history or other medications.  Plaintiff sought

---

[3] Spurling's test is a physical exam used to diagnose
neurological conditions.  The method involves light
manipulation of the patient's neck by the doctor and slight
pressure on the head: pain in the extremity of the tested
side indicates a positive sign, which signifies nerve root
swelling of the cervical spine. DAN J. TENNENHOUSE, MD, JD, 2
ATTORNEYS MEDICAL DESKBOOK § 18:4 (4th ed. 2011).

care because of complaints of depression, anxiety, panic
attacks with agoraphobia, and some hallucinations.  However,
Plaintiff did not report nightmares, flashbacks or any
problems sleeping. (A.R. 345.)

   During this exam, the doctor observed Plaintiff to be
pleasant, calm, cooperative, though a bit tired.
Plaintiff's affect was appropriate, his thought process goal
directed, and his speech processes were normal.  The
doctor's overall assessment was that Plaintiff was isolated
and depressed, but that he had a Global Assessment
Functioning ("GAF") score of 65.[4]  She diagnosed Plaintiff
with major depressive disorder with psychotic features and
panic disorder with agoraphobia. (A.R. 346.)

   Following this assessment, Plaintiff continued seeking
treatment from Clinical Support Options, receiving therapy
from Karolyn Kiehn, APRN, from April 11, 2008, until May 28,
2009.  Kiehn generally found Plaintiff to be progressing
positively: she noted continued improvement in motivation,

_____

   [4] According to the ALJ report, a GAF score of 65
indicates "mild symptoms or some difficulty in social,
occupational or school functioning, but generally
functioning pretty well." (A.R. 32, citing DIAGNOSTIC &
STATISTICAL MANUAL OF MENTAL DISORDERS (4th ed. 1994).)

7

focus, and his orientation towards the future.  (A.R. 260, 331-40, 361, 414-24.)  Kiehn remarked that Plaintiff responded well to Concerta[5] throughout this period.

On May 28, 2008, Dr. Richard Schuetz conducted a psychological evaluation of Plaintiff, including a psychodiagnostic interview and intelligence testing.  The doctor noted that Plaintiff reported he could perform household chores independently, including cooking from a recipe for himself and managing his bank account and bills. He was licensed to drive, could read articles and retain the information, and count out correct change when making purchases.  However, Plaintiff reported difficulty in writing, particularly with spelling.  The doctor observed that Plaintiff was "generally able to focus well on task or topic, was not prone to distraction in relation to external stimuli, and did not show excess psychomotor discharge." (A.R. 249-50.)  Plaintiff's demeanor, the doctor noted, was sullen and surly, at times quarrelsome, which the doctor

---

[5] Concerta, which goes by the generic name d,l methylphenidate, is a function enhancing drug most often used to treat ADHD and depression.  Another well-known brand-named drug of this kind is Ritalin.  2 ATTORNEYS MEDICAL DESKBOOK § 39:8.

found suggestive of depression.

The doctor administered the 21 Item Memory test, on which Plaintiff performed perfectly.  Plaintiff also performed serial sevens with one error in five steps, used a serviceable vocabulary with occasional more sophisticated usages, recalled two of three words after ten minutes, and knew the presidents back to Reagan.  The doctor did note that Plaintiff had some difficulty in constructing complex sentences and tended to stumble over words.  (A.R. 250.)

The doctor recorded Plaintiff's concerns, complaints, and history of symptoms as including a previous diagnosis of ADHD and unspecified learning issues.  Plaintiff reported that he was depressed most days, and had some suicidal ideation and some obsessive compulsive tendencies.  In his summary, the doctor stated that "[i]t seems very possible that learning, expressive, and attentional issues have conspired to make adjustment to the work place very difficult."  (A.R. 254.)  The doctor diagnosed Plaintiff as having attention deficit hyperactivity disorder ("ADHD") and dysthymic disorder.[6]

_____

[6] Dysthymic disorder is a "chronic mood disorder manifested as depression for most of the day, more days than

On July 14, 2010, Plaintiff underwent an adult comprehensive assessment by Philip Wilson, LMHC.  The report noted that Plaintiff presented with "highly anxious mood and panic as his main concern along with mood instability." (A.R. 440.)  It further stated that Plaintiff was well-spoken, motivated, and insightful, though his posture, body movement, and facial expressions all reflected agitation and anxiety.  (A.R. 436, 440.)

C.    Disability Evaluations.

On February 26, 2009, two state agency doctors reviewed Plaintiff's medical records to assess the medical evidence. Dr. Ram Upadhyay provided a internal medicine review, in which he found that Plaintiff's symptoms were attributable to a medically determinable impairment and that Plaintiff's severity and duration of symptoms were not disproportionate but were supported by the medical and non-medical evidence. (A.R. 407.)  Thus, the doctor concluded that, due to multi-level disc disease, Plaintiff's work should be limited to light exertion that avoids frequent reaching, including overhead and bilaterally, and that restricts his exposure to

---

not," accompanied by other symptoms such as helplessness and fatigue.  STEDMANS MEDICAL DICTIONARY (27th ed. 2000).

machinery and heights. (A.R. 404-6.)

Dr. Brian O'Sullivan provided a psychology review, which determined that Plaintiff had the medically determinable impairments of ADHD with features of verbal learning disabilities, dysthymia with anxiety, and substance addiction disorders. (A.R. 388, 390, 387.)  However, the doctor concluded that, in social interactions, Plaintiff could be socially effective, generally relating well to co-workers and superiors, but that anger problems with the general public could emerge when he was intoxicated. Finally, the doctor concluded that Plaintiff could learn and remember simple, routine directions and could keep average pace for simple routine tasks.  Dr. O'Sullivan's summary also noted Plaintiff's occasional concentration, motivation, and punctuality problems.  (A.R. 385.)

D.   ALJ Hearing.

Plaintiff's hearing before the ALJ occurred on September 21, 2010.  During the hearing, the ALJ took sworn testimony from Plaintiff, from Plaintiff's therapist Philip A. Wilson, and from an impartial vocational expert, Larry Takki.  Plaintiff did not have legal representation, but he

11

brought along Wilson, intending him to serve as both an
advocate and a witness for his mental disabilities.  The ALJ
informed Plaintiff that Wilson could be either his advocate
or a witness providing an objective assessment, but not
both.  After some consultation with Plaintiff and Wilson,
the ALJ designated Wilson as a witness.

In the process of explaining to Plaintiff how the
hearing would work, the ALJ represented to Plaintiff that
she would "walk [him] through" the proceeding. (A.R. 52.)
The ALJ assured Plaintiff that all he had to do was answer
her questions and, if he didn't understand something, she
would explain it to him.  (A.R. 52-3.)  The ALJ thereafter
proceeded to question Plaintiff regarding why he felt he was
disabled.  (A.R. 52-3.)

Plaintiff testified that he had a neck injury that was
not improving and degenerative disc disease; he also said he
had major depression and anxiety, post-traumatic stress
disorder ("PTSD"), ADHD, and obsessive compulsive disorder.
Plaintiff testified that one major hurdle for him in seeking
and receiving treatment was his lack of transportation.  He
felt that he had great difficulty keeping his previous jobs,

except the seasonal ones, because of the panic and anxiety attacks he suffered while around people.  (A.R. 60-1.)  In response to questions regarding his ability to care for himself, Plaintiff stated that he could manage his own money, occasionally do his own laundry, and buy food.

Next, Wilson testified that his practice team diagnosed Plaintiff with ADHD, PTSD, major depression, and panic disorder with agoraphobia.  (A.R. 68-9.)  The ALJ put questions to Wilson designed to probe his opinions on Plaintiff's symptoms and how they affected his ability to function.  When asked specifically whether, in light of his anxiety around people, Plaintiff could return to the workplace, Wilson testified that he did not think that Plaintiff would never be able to work.  Rather, he stated that, at that time, given his multiple emotional and physical difficulties, Plaintiff was unable to cope with the pressures and stresses of the workplace.  (A.R. 73-5, 80.)

Finally, the ALJ interviewed Takki, the vocational expert.  In response to a hypothetical question about jobs with physical and mental limitations that fell within Plaintiff's restrictions, Takki testified that there

13

currently existed no work that fell within Plaintiff's

previous employment history.  (A.R. 86.)  However, Takki

identified three other jobs that Plaintiff had not done

before but that he could perform within his limitations.

At several points during the hearing, the ALJ's

inquiries took on an aggressive tone.  The following

exchange, for example, took place between the ALJ and

Plaintiff:

    Q: So if there was a job that could be done that didn't
    require a high school degree of some type, would you be
    willing to do that job?
    A: It depends.
    Q: On what?
    A: I have a lot of anxiety issues being around people.
    Q: [INAUDIBLE] anxiety issues [INAUDIBLE]?
    A: I can't be around people.
    Q: Well, talk to me.
    A: It's ---
    Q: Excuse me, let me explain. It doesn't paint a
    picture for me, I can't be around people.
    A: When I'm around people, I have panic attacks. I have
    anxiety, my heart starts pounding, I feel like people are
    out to get me.
    Q: And how long has this been going on?
    A: Four or five years.
    Q: Four or five years. And did it ever stop you from
    work?
    A: I would say it had a lot of effect on my previous
    work.
    Q: And when you say an effect, what do you mean by
    that?
    A: Having panic attacks during work, anxiety, feeling
    like I'm going to have a heart attack.
    Q: And then what did you do? How did that affect your

14

job? Did you walk off the job?

    A: Yes.

    Q: And how may times did that happen?

    A: Pretty much every job I did that except for -- the only jobs I didn't get fired were seasonal.

    Q: Okay. The only jobs I didn't get fired were seasonal.

    A: Right, that I didn't quit or walk away from.

    Q: Okay. And they were -- are you trying to tell me that all the jobs that you quit or walked away from was because of anxiety attacks [INAUDIBLE]?

    A: Yeah, and my learning disability and several other things.

    Q: So there are several other things. And your learning disability affected your jobs how?

    A: Reading and writing.

    Q: And what jobs did you have that you weren't able to read and write?

    A: Pretty much any job.

    Q: Pretty much any job. What jobs did you have that required you to read and write?

    A: Let's see, I was a stock boy. I had to write what I was stocking, write down what I did for my job.

    Q: Okay.

    A: I worked for the state DAR, state forest, I had to check-in, register visitors, [INAUDIBLE] down.

    Q: You had to [INAUDIBLE]?

    A: No, [INAUDIBLE].

    Q: Why?

    A: Because I didn't understand.

    Q: No, that is just a statement that I don't get. Could you read sentences --

    A: No.

    Q: -- that was on the form?

    A: Some of them, yes.

    Q: You couldn't read the sentences on the form?

    A: I could read sentences.

    Q: Okay, you could read sentences, and so what was so hard about you filling out the form?

    A: The writing.

    Q: You had [INAUDIBLE]?

    A: No.

Q: You cannot write? Who filled out your forms?
A: I copied it from my therapist.
Q: Who filled out your forms for your application for social security disability?
A: My mother helped me. Several people helped me.
Q: I'm not talking about helping. Who hand wrote the forms? Are you telling me somebody else hand wrote those forms?
A: Probably, yes.
Q: There is no probably. You don't remember?
A: No, I don't remember. It was over three years ago. Actually to be honest with you I think the social security people helped me fill out a lot of the forms.
Q: I want you to come over here. I want you to look at this handwriting and tell me if this is your handwriting. Come on. ...

(A.R. 60-3.)

The ALJ's aggressive tone emerges even more clearly in her interaction with Wilson.  She interrupted Wilson numerous times to stop his testimony on the diagnoses and press him to talk about the impact on Plaintiff's work.  The ALJ specifically asked Wilson what symptom validity testing he had done with Plaintiff to determine whether Plaintiff was feigning symptoms.  Wilson answered that he found Plaintiff's symptoms to be genuine. (A.R. 77-8.)  At one point during Takki's testimony, Wilson tried to make a comment that the jobs they were discussing involved physical exertion and that Plaintiff had degenerative disc disease.

ALJ: Mr. Wilson, you are here as a witness. If you are

going to make a comment relating to something that you had
said that was psychologically related –
    Wtn:      Yes.
    ALJ: -- fine, but you're crossing the line, sir.
    WTN: Okay.
    ALJ: I'm always happy to hear if you have a comment
that you would like to proffer in your area or anything
about these jobs that affects your area, but not when it
comes to medicine.
(A.R. 84.)

At another point during Takki's testimony, Plaintiff

interrupted and disputed the work limitations that the ALJ

was considering.  Based on Plaintiff's earlier medical

records, the ALJ considered work with only some restrictions

on lifting weight above ten or twenty pounds.  At the

hearing, Plaintiff presented a new letter from one of his

doctors.  This letter stated that Plaintiff had "significant

pain" and that the pain was "disabling and impairs his

ability to work."  (A.R. 445.)  Plaintiff and the ALJ argued

briefly over whether the note implied that he could not lift

at all.[7]  (A.R. 85-6.)

    A: ...I can't lift that anymore.
    Q: And why do you say that?
    A: Because my arms go numb.

---

    [7]  Plaintiff also argued with the ALJ over his history
of using marijuana.  The ALJ asked him how he got money to
buy drugs if he had not been substantially employed for over
six years. Shortly thereafter, Plaintiff asked the ALJ why
she kept bringing up his earlier drug use.  (A.R. 82, 84.)

Q: And has a doctor told you not to lift anything?
A: Yes, they have. If my arms start going numb, don't lift anything. I think I gave you the piece of paper.
Q: No, there is no restriction on that paper. It says you have significant pain. He is currently undergoing treatment with his orthopedist and he has referral pending with the back specialist. His pain can be quite disabling and impairs his ability to work. Please feel free to contact me if I may be of further assistance.
A: That would be further assistance.
Q: Sorry, it's not good enough.
(A.R. 85-6.)

E.   ALJ's Findings.

The ALJ followed the five-step sequential disability determination.  20 C.F.R. § 416.920 (2012).  At step one, she determined that Plaintiff had not been engaged in substantial gainful activity since October 2, 2002, the alleged onset date of his disability.  (A.R. 28-9.)  At step two, she found that Plaintiff had the severe impairments of depression, cervical disc disease, and shoulder pain. (A.R. 29.)  At step three, the ALJ found that Plaintiff's impairments did not meet or medically equal an entry on the List of Impairments, 20 C.F.R. pt. 404, subpt. P, app. 1 (2012).  (A.R. 24-30.)  Proceeding to step four, the ALJ found that Plaintiff had a residual functional capacity ("RFC") to perform light work with the limitations of

lifting twenty pounds occasionally and ten pounds

18

> frequently; involving sitting, standing and
> walking a maximum of six hours out of an eight
> hour day; involving unlimited pushing and pulling;
> occasional climbing of ramps, stairs, ladders,
> ropes, scaffolds; occasional stooping, crawling
> and overhead reaching; can understand remember and
> carry out simple instructions in a routine
> environment; can concentrate for up to two hours
> at a time before needing a normal break; should
> have no interaction with the public; and can
> engage in simple, routine changes in the
> workplace.

(A.R. 30-1.)  Based on these limitations, the ALJ determined

that Plaintiff was unable to return to past work. (A.R. 34.)

Finally, at step five, the ALJ determined that within

his RFC, and considering Plaintiff's age, education, and

work experience, he was "capable of making a successful

adjustment to other work that exists in significant numbers

in the national economy." (A.R. 35.)  Accordingly, the ALJ

determined that Plaintiff was not disabled, as defined in

the Social Security Act. (A.R. 36.)

### III.   DISCUSSION

Plaintiff's arguments for reversing or remanding the

ALJ's decision fall into two areas.  The first and more

customary contention is that the ALJ's decision was in error

for failing to consider the evidence properly and for making

findings that were not based on substantial evidence of

19

record.  The court will address these various arguments
together.  The second basis is more unusual and, in the
court's opinion, of more concern: that the ALJ committed an
abuse of discretion because she was biased against
Plaintiff, thus depriving him of a fair hearing.  The court
will address this argument separately.

A.  <u>Standard of Review</u>.

Judicial review of a final decision of the Commissioner
is limited to (1) whether substantial evidence supports the
Commissioner's decision, and (2) whether the Commissioner
applied the correct legal standards.  <u>Seavey v. Barnhart</u>,
276 F.3d 1, 9 (1st Cir. 2001).  The responsibility for
weighing conflicting evidence and resolving issues of
credibility belongs to the Commissioner and his designee,
the ALJ.  <u>Id.</u> at 10; <u>Rodriguez v. Sec'y of Health & Human
Servs.</u>, 647 F.2d 218, 222 (1st Cir. 1981).  The
Commissioner's findings "as to any fact, if supported by
substantial evidence, shall be conclusive."  42 U.S.C. §
405(g).  Substantial evidence is such evidence "as a
reasonable mind might accept as adequate to support a
conclusion."  <u>Richardson v. Perales</u>, 402 U.S. 389, 401

(1971)(internal citations omitted).  Accordingly, the court must affirm the Commissioner's findings "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion."  Rodriguez, 647 F.2d at 222.  This is true "even if the record arguably could justify a different conclusion."  Rodriguez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987) (per curiam).

B.    Consideration of the Evidence.

     First, Plaintiff argues that the ALJ committed several errors of law in (1) not considering all of Plaintiff's severe impairments, (2) not properly evaluating Plaintiff's pain, and (3) not properly assessing Plaintiff's credibility.  Though the ALJ recognized the impairments of depression and neck and shoulder pain, Plaintiff asserts the ALJ should have also included ADHD, panic disorder, PTSD, and learning disabilities.[8]  For support of the severity of these impairments, Plaintiff cites the psychiatric

_____

     [8] It is noteworthy that Plaintiff listed only depression, not ADHD, PTSD, panic disorder, or learning disabilities, in his original application for benefits. (A.R. 176.)  Neither did he include these other conditions in his updated disability reports. (A.R. 222.)

evaluation by Dr. Richard Schuetz (A.R. 248-54) and the
psychiatric review by Dr. Brian O'Sullivan (A.R. 388) in
which the doctors considered ADHD a reasonable diagnosis, as
well as the medical assessment by Dr. Amy Barnard diagnosing
panic disorder with agoraphobia (A.R. 378-380).
Additionally, Karolyn Kiehn, RNPC, listed ADHD and PTSD
among Plaintiff's diagnoses in her EAEDC Medical Report
(A.R. 425), dated December 4, 2009.

   The court finds that the ALJ determination of
Plaintiff's severe impairments was not deficient.  It is not
enough for Plaintiff to be diagnosed with certain
impairments: Plaintiff must provide evidence that these
impairments "significantly limit[] [his] physical or mental
ability to do basic work activities." 20 C.F.R. §
404.1520(c).  Though Kiehn's December report lists ADHD and
PTSD, her clinical notes prepared after therapy appointments
consistently note Plaintiff's positive responses to
medication, and his stable presentation and mental status.
Neither is there any evidence in the other reports cited by
Plaintiff of significant limitation imposed by these
conditions.  Dr. Barnard's evaluation assigns Plaintiff a

22

global assessment functioning score of 65, indicative, as
the ALJ noted, "of mild symptoms or some difficulty in
social, occupational or school functioning, but generally
functioning pretty well." (A.R. 32.)  Moreover, the state
agency physician, Dr. O'Sullivan, determined that
Plaintiff's ADHD, though present, did not rise to the level
of severe impairment.

Finally, though the ALJ did not consider Plaintiff's
ADHD, PTSD, panic disorder, and learning disabilities to be
severe impairments, she did take them into account in her
step-four analysis, in which she determined Plaintiff's
residual functional capacity. (A.R. 31-2.)  In light of
this, it cannot be said that the ALJ erred in her
determination of Plaintiff's severe impairments.

Plaintiff also contends that the ALJ erred in not
properly considering his subjective assessment of pain and
in finding Plaintiff's testimony regarding his inability to
work not credible.  Applying the "substantial evidence"
standard, the ALJ's analysis was adequately supported by the
record.

It is well established that the ALJ has the

responsibility to determine issues of credibility and to
draw reasonable inferences from the record.  <u>Irlanda Ortiz
v. Sec'y of Health & Human Servs.</u>, 955 F.2d 765, 769 (1st
Cir. 1991).  A plaintiff's description of symptoms and
limitations cannot by itself establish disability; the ALJ
must also consider objective medical evidence and any other
available evidence, such as medications and daily
activities, to determine whether the plaintiff's testimony
is consistent with the remainder of the record.  20 C.F.R. §
404.1529(a), (c).  The ALJ's credibility determination "is
entitled to deference, especially when supported by specific
findings."  <u>Frustaglia v. Sec'y of Health & Human Servs.</u>,
829 F.2d 192, 195 (1st Cir. 1987).

     The ALJ noted specific evidence in support of her
finding that Plaintiff's assessment of his pain was not
entirely credible and that Plaintiff's testimony should be
given little weight.  The ALJ noted that Plaintiff testified
that he was unable to work in any capacity because of his
impairments; however, there was ample medical evidence in
the record that conflicted with Plaintiff's assessment.
The objective medical records in evidence, while supporting

24

his claim of pain in his arms and neck, did not evince a disabling amount of pain.  Several doctors noted full strength and range of motion, as well as Plaintiff's comfort while seated and discomfort only when his arms and neck were manipulated in certain ways.

The ALJ also cited Plaintiff's physical examination for the carpenter's union, dated January 15, 2008: Plaintiff was cleared for employment as his neck was improved.  (A.R. 32, 266.)  Moreover, there was ample evidence in the record of Plaintiff's ability to care for himself, prepare meals, drive, do laundry, play video games, and go for walks -- some of this bolstered by Plaintiff's own testimony at the ALJ hearing.

The record here is clearly mixed, and it is possible (particularly considering Mr. Wilson's testimony) that another conclusion might be drawn from the evidence. However, in light of the medical evidence viewed as a whole, it cannot fairly be said that the ALJ's determination lacked substantial support.  The ALJ was entitled reach her own conclusion that Plaintiff's assessment of his pain was not credible and that his testimony should be given limited

weight.  See id. at 195 (finding that "inconsistencies in
the record support the ALJ's determination that the
claimant's subjective complaints were not credible").

Finally, Plaintiff argues that the ALJ's decision was
not based on the substantial evidence in the record because
she improperly discounted medical evidence presented by two
separate health care providers.  The ALJ designated the
medical reports of Kiehn and Friedman as non-acceptable
medical sources because the signature of Friedman, the
supervising psychiatrist, was illegible and because the ALJ
found the report internally inconsistent.  Also, the ALJ
found the hearing testimony of Plaintiff's therapist,
Wilson, to have little weight because she considered Wilson
to be an interested witness.

The reliance on the illegibility of the doctor's
signature is dubious.  Doctors are famous for their
indecipherable handwriting.  On the other hand, the ALJ was
permitted to weigh the medical findings in Kiehn's report in
light of the record as a whole.  (A.R. 33.)  Where there is
conflicting evidence, it is the ALJ not the court who
determines what is conclusive.  Seavey, 276 F.3d at 10.

This is not a case where the ALJ failed to consider the evidence at all; she considered Kiehn's report and determined it to be non-persuasive in the light of the other evidence of record.  While Plaintiff characterizes his mental impairments as disabling his ability to work with others, the record supports a determination to the contrary. Many of the elements of Kiehn's report supported a conclusion that Plaintiff, while impaired, was not disabled. For example, her November 24, 2008, notes from seeing Plaintiff describe him as smiling, friendly and pleasant, doing well, and planning to visit his sister.  (A.R. 331.) Her notes on May 4, 2009, record her assessment that Plaintiff is pleasant and making good eye contact, despite his having had a rough winter and being a little on edge. (A.R. 417.)  There are sufficient contradictions within Kiehn's reports alone to support the ALJ's decision to afford it little weight.

The ALJ was similarly within her province in partially discounting Wilson's testimony.  Significantly, the ALJ did not reject all of his medical evidence on record; she cited his medical report in discussing Plaintiff's mental

impairments. (A.R. 33, citing Exhibit 21F.)  The ALJ's main area of skepticism was focused on Wilson's determination of Plaintiff's disability.  On this point, the law counsels deference to the ALJ's on-the-scene credibility determination. See Frustaglia, 829 F.2d at 195.

It is possible, if this decision were up to the undersigned, the outcome might have been different.  But that is not the test.  The test is whether the record, viewed as a whole, contains substantial evidence supporting the ALJ's findings.  It does.

C.   Abuse of Discretion.

"An administrative law judge shall not conduct a hearing if he or she is prejudiced or partial with respect to any party."  20 C.F.R. § 404.940.  In assessing a charge of bias, the court must start with the presumption that the ALJ is unbiased, but this "presumption can be rebutted by a showing of conflict of interest or some other specific reason for disqualification." Schweiker v. McClure, 456 U.S. 188, 195 (1982).  Plaintiff bears the burden of establishing a reason for disqualification.  Id. at 196.

Plaintiff alleges bias on the part of the ALJ based on

28

what Plaintiff views as the impatient and curt manner in
which she conducted the hearing.  Plaintiff argues that the
ALJ's demeanor impeded his ability to put on sufficient
favorable evidence during the hearing, particularly since he
was without the benefit of counsel.  Moreover, Plaintiff
argues that given his particular mental impairments -- his
learning disabilities and panic disorder -- he was
prejudiced by the ALJ's brusque and aggressive manner.

     The Supreme Court has observed that remarks by the ALJ
during the hearing that are critical or even hostile to a
party are, alone, ordinarily insufficient to support a bias
challenge.  <u>Liteky v. United States</u>, 510 U.S. 540, 555-6
(1994) (stating that "expressions of impatience,
dissatisfaction, annoyance, and even anger" are alone not
enough to establish bias or partiality).  For the court to
find bias on the ALJ's remarks alone -- and not some
external factor demonstrating, for example, a conflict --
the remarks would have to show such a high degree of
antagonism that a fair judgment would be impossible.  <u>Id.</u>

     This is admittedly a difficult call for the court to
make on a cold record.  Some of the ALJ's interruptions and

comments might, or might not, have been discourteous or
intimidating depending on how they were delivered.  For
example, this court cannot say that the ALJ acted
unreasonably in requiring Plaintiff's therapist, Mr. Wilson,
to occupy one role.  However, the court recognizes that this
requirement may have placed this unsophisticated Plaintiff
in a vulnerable position, one that may have hampered his
ability to present his case effectively.  Furthermore, this
vulnerability may have been exacerbated by what appeared to
be the brusque tone set by the ALJ.  Certainly, Plaintiff
would have been better off with an attorney representing
him, as most plaintiffs would in these proceedings.  On a
mixed record like this, skillful advocacy might have turned
the tide.

       Nonetheless, many plaintiffs pass through the
application process without professional representation, and
this disadvantage, while often severe, cannot form the basis
of any conclusion that the process lacked fundamental
fairness, let alone that the ALJ was biased.  In the end,
the evidence of record is simply insufficient to support a
finding that the ALJ's remarks reflected such a high degree

of antagonism that remand is required.

## IV. CONCLUSION

For the foregoing reasons, Plaintiff's Motion To Reverse or Remand the Decision of the Commissioner (Dkt. No. 8) is hereby DENIED, and Defendant's Motion for Order Affirming the Decision of the Commissioner (Dkt. No. 11) is hereby ALLOWED.[9]  The clerk will enter judgment for Defendant.  This case may now be closed.

It is So Ordered.

                                    /s/ Michael A. Ponsor
                                    MICHAEL A. PONSOR
                                    U.S. District Judge

_____

[9] This is not necessarily the end for Plaintiff. Plaintiff can reapply for prospective SSI benefits, perhaps with the assistance of counsel, based on a fuller medical record or evidence that his condition has deteriorated.

31